UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| DANIEL J. WHITE, | ) |
| | ) |
|     Plaintiff/Counter-Defendant, | ) |
| | ) |
| v. | )   Case No. 4:23-cv-04022-SLD-JEH |
| | ) |
| DEERE & COMPANY, | ) |
| | ) |
|     Defendant/Counter-Claimant. | ) |

### ORDER

Before the Court is Defendant Deere & Company's motion to dismiss Count I, ECF No. 6; Defendant's motion for leave to file a reply, ECF No. 11; and Plaintiff Daniel J. White's motion to cite additional authority, ECF No. 15.  For the following reasons, Defendant's motion to dismiss Count I is DENIED; Defendant's motion for leave to file a reply is GRANTED; and Plaintiff's motion to cite additional authority is GRANTED.

### BACKGROUND[1]

Plaintiff, who has extensive experience in the battery field, was hired by Defendant to develop autonomous (*i.e.*, self-driving) battery-powered tractors and farm implements.  He began his employment in February 2022.

That June, Plaintiff visited Kreisel Electric, Inc. ("Kreisel").  Kreisel is an Austrian manufacturer supplying batteries for electric vehicles; earlier that year, Defendant acquired a majority interest in Kreisel.  While at Kreisel, Plaintiff "identified safety issues regarding Kreisel's immersion cooling . . . which could lead to safety issues including . . . electrical shock,

---

[1] At the motion to dismiss stage, the court "accept[s] as true all well-pleaded facts in the complaint, and draw[s] all reasonable inferences in [the plaintiff's] favor." *Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016).  Thus, unless indicated otherwise, this factual background comes from the complaint, ECF No. 1-1.

delayed or immediate catastrophic thermal runaway event, and hydrogen explosion" caused by water contamination in the coolant or "foreseeable mistake by an . . . individual working on the vehicle where they fill the battery with a more common coolant . . . instead of the currently proprietary battery coolant." Compl. 2, ECF No. 1-1 (specifically identifying the "largest concern [as] being that the cells did not have an electrical insulation layer between them and the coolant"). Shortly after, Plaintiff expressed safety concerns with the immersion cooling at a group meeting with Electric Powertrain Director Jenny Preston.

At some point, Senior Vice President Pierre Guyot[2] sent Plaintiff and others a directive mandating use of Kreisel batteries. Then, in August 2022, Plaintiff shared his concerns with his supervisor and Director of Finance for Power Systems John Vaaler, advising the latter that Defendant needed to hire a battery consultant to independently review the safety of the battery. *Id.* at 3. After Guyot sent a second directive requiring Kreisel, Plaintiff also "walk[ed] [Guyot] through" his concerns with the immersion cooling. *Id.*

In "September 2022, Plaintiff forwarded a test plan proposal for the Kreisel battery to Preston." *Id.* at 4. Preston instructed Plaintiff not to conduct any testing, including "immersion, vibration, shock, and salt spray, . . . common safety tests as outlined in UL 2054 and UL 2580 used to identify weaknesses within the design and address common hazards of the technology for the safety of workers, users and the public." *Id.* In doing so, Plaintiff alleges, Defendant also "failed to follow common design practice and identify and correct conditions of foreseeable misuse . . . as defined in IEC 62368 (as well as other standards), which could be chosen to qualify the battery driven audio and visual systems in the equipment as well as IEC62619 which could be chosen to qualify the battery system." *Id.*

---

[2] Preston and Guyot held roles at Kreisel also.

On October 5, 2022, Plaintiff explained to Wes Robinson, who worked on the Kreisel deal, "the safety issues with [the] Kreisel battery, that they were being forced to use them, that they were not allowed to test, and that he was extremely concerned about those safety issues." *Id.* at 5. Later that month, Defendant's competitor "experienced a catastrophic battery fire in a battery-powered zero-turn radius (ZTR) mower at the world's largest equipment show." *Id.* In response, Plaintiff "emailed senior leaders . . . that the competitor's fire/explosion was likely from water contamination and that the Kreisel battery need[ed] to be evaluated or a more mature alternate technology need[ed] to be chosen." *Id.* at 6. Plaintiff also told his supervisor he did not feel comfortable fielding prototypes with Kreisel batteries because his team was not trained to respond to an event like the ZTR fire. Later, he contacted Global Engineering Manager Steve Edwards, who reviewed a video of the fire and "agreed to help engage the battery team to get some level of understanding of the Kreisel [b]attery technology and information to the individuals engaging with the technology." *Id.* at 7.

On October 25, 2022, Plaintiff had meetings with Defendant's President of Agriculture & Turf and Chief Financial Officer to discuss his concerns with the batteries. The next day, he sent Edwards a proposed test plan. On October 31, 2022 or November 1, 2022, he was terminated.

Plaintiff filed his complaint alleging the above in state court on December 27, 2022, *see id.* at 1, bringing as Count I a common law retaliatory discharge claim against Defendant, *id.* at 1–9. In Count II, he seeks a declaratory judgment related to a Retention Agreement between himself and Defendant, *id.* at 9–11, which is not at issue in this motion, *see generally* Mot. Dismiss (seeking to dismiss Count I alone). Defendant removed the case on February 3, 2023,

*see* Not. Removal 1, ECF No. 1, then moved to dismiss Count I on March 13, 2023, Mot. Dismiss 1.[3] The other instant motions followed.

## DISCUSSION

### I. Plaintiff's Motion to Cite Additional Authority

Courts may grant parties leave to file additional authority when recent caselaw sheds light on an issue of relevance to a motion's disposition. *See, e.g.*, *Clinton Hill v. Sood*, Case No. 18-4133, 2020 WL 12697470, at *1 (C.D. Ill. Feb. 20, 2020). Here, Plaintiff asks to point the Court to *Levine v. UL LLC*, Case No. 1-22-1845, 2023 WL 4067332 (Ill. App. Ct. June 20, 2023), which he argues is "relevant to the issues raised in Defendant's motion to dismiss." Mot. Auth. 1–2. Defendant does not oppose the motion, but argues *Levine* is irrelevant and not in support of Plaintiff's position. *See* Resp. Mot. Auth. 1–2, ECF No. 16. Nevertheless, the Court can access the opinion itself. *Cf. Cummins, Inc. v. TAS Distrib. Co.*, 676 F. Supp. 2d 701, 705 (C.D. Ill. 2009) ("The Court is quite capable of determining the effect of these supposed misstatements of law on its own . . . ."). In any event, it is not clear parties must seek leave to file additional authority. *See Duerr v. Bradley Univ.*, Case No. 1:21-cv-01096-SLD-JEH, 2022 WL 1487747, at *2 n.2 (C.D. Ill. Mar. 10, 2022) (finding "nothing barring" the Court from considering the plaintiffs' supplemental authority, which was filed "without seeking leave to do so"). Accordingly, Plaintiff's motion to cite to additional authority is granted.

### II. Defendant's Motion to File a Reply

For all motions other than those for summary judgment, the Local Rules provide that "[n]o reply to the response is permitted without leave of Court." *See* Civil LR 7.1(B)(3). "Typically, reply briefs are permitted if the party opposing a motion has introduced new and

---

[3] That same day, Defendant also filed counterclaims against Plaintiff—for breach of contract and unjust enrichment—that are not at issue here. *See* Def.'s Partial Ans., Defenses & Countercls. 24, ECF No. 8.

unexpected issues in his response to the motion, and the Court finds that a reply from the moving party would be helpful to its disposition of the motion." *Shefts v. Petrakis*, Case No. 10-cv-1104, 2011 WL 5930469, at *8 (C.D. Ill. Nov. 29, 2011). A reply may also be permitted "in the interest of completeness." *Vought v. Bank of Am., N.A.*, Case No. 10-CV-2052, 2013 WL 3336883, at *2 (C.D. Ill. July 2, 2013). Here, Defendant moves for leave to file a reply to address Plaintiff's "inapt reliance" on *Cupi v. Carle Brommen Med. Ctr.*, Case No. 1:21-cv-01286, 2022 WL 808209 (C.D. Ill. Mar. 16, 2022). *See* Mot. Leave File Reply 1. Plaintiff has filed no response. *See* Civil LR 7.1(B)(2). Seeing no response, and because the Court finds that Defendant's proposed reply is appropriately limited in scope and would advance the interest of completeness, Defendant's motion for leave to file a reply is granted. The Clerk is directed to file Defendant's reply, ECF No. 11-1 ("Reply"), on the docket.

### III. Defendant's Motion to Dismiss Count I

#### a. Legal Standard

A complaint must contain a "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A party may move to dismiss a complaint if it fails to state a claim upon which relief can be granted. *Id*. 12(b)(6). To analyze the sufficiency of a complaint, the court "must construe it in the light most favorable to the plaintiff, accept well-pleaded facts as true, and draw all inferences in the plaintiff's favor." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826 (7th Cir. 2014). A court must "determine whether [the complaint's well-pleaded factual allegations] plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). These allegations must "raise a right to relief above the speculative level." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008) (quotation marks omitted); *see also Carlson*, 758 F.3d at 826–27 ("A claim must be plausible rather than

merely conceivable or speculative, meaning that the plaintiff must include enough details about the subject-matter of the case to present a story that holds together." (citations and quotation marks omitted)).

    **b. Analysis**

In Count I, Plaintiff brings a common law retaliatory discharge claim against Defendant. *See* Compl. 1–9. In Illinois,[4] this tort is "a narrow exception to the general rule" that "a noncontractual or at-will employee may be discharged by his or her employer at any time and for any reason." *Michael v. Precision All. Grp.*, 21 N.E.3d 1183, 1188 (Ill. 2014). "To state a valid retaliatory discharge cause of action, an employee must allege that (1) the employer discharged the employee, (2) in retaliation for the employee's activities, and (3) that the discharge violates a clear mandate of public policy." *Turner v. Mem'l Med. Ctr.*, 911 N.E.2d 369, 374 (Ill. 2009); *Barr v. Kelso-Burnett Co.*, 478 N.E.2d 1354, 1358 (Ill. 1985) ("In order to state a valid retaliatory-discharge cause of action, the plaintiff must allege that he was discharged in retaliation for his activities and that his discharge violates a clear mandate of public policy.").

What it means for a discharge to violate such a mandate lacks "precise definition." *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 277 F.3d 936, 941 (7th Cir. 2002) (quoting *Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876, 878 (Ill. 1981)). Still, "[a]lthough what counts as a clearly mandated public policy is not precisely defined, the tort has been narrowly construed in Illinois to include only discharges in retaliation for certain activities, such as reporting an employer's criminal violations, or violations of health and safety standards." *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 628–29 (7th Cir. 2009) (internal citations

---

[4] Neither party disputes Illinois law applies. *See, e.g.*, Mem. Supp. Mot. Dismiss 4, ECF No. 7 (addressing what is required for Plaintiff to "[t]o establish a claim for retaliatory discharge under Illinois common law"); Resp. Mot. Dismiss 7, ECF No. 10 (same).

omitted). Ultimately, the matter must "strike at the heart of a citizen's social rights, duties, and responsibilities" so not "only private interests are at stake." *Palmateer*, 421 N.E.2d at 878–79.

Clear mandates of public policy can be found "in the State's constitution and statutes and, when they are silent, in its judicial decisions." *Id.* at 878. Here, Plaintiff's position is that his discharge violates the public policy embodied in the general duty clause of the Occupational Health and Safety Act of 1970, 9 U.S.C. §§ 651–78 ("OSHA"). [5] *See* Resp. Mot. Dismiss 7, ECF No. 10. The general duty clause provides in full that each employer "shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." 29 U.S.C. § 654(a)(1).

However, Defendant insists the general duty clause cannot suffice as a source of public policy. Mem. Supp. Mot. Dismiss 7–9. Defendant suggests that the general duty clause is too vague to be the source of a clearly mandated public policy, citing the Illinois Supreme Court's instruction in *Turner* that an employer "should not be exposed to liability where a public policy standard is too general to provide any specific guidance or is so vague that it is subject to different interpretations." *Id.* at 7 (quoting *Turner*, 911 N.E.2d at 375 (quotation marks omitted)). Instead, Defendant insists that a statue must directly "govern or address the particular conduct or issues raised by Plaintiff" to form the basis of his claim such that he must cite to a

---

[5] Defendant argues that "[a]s a matter of law, . . . UL and IEC standards, the OSHA General Duty Clause, and the OSHA Letter all fail to set forth the clearly mandated public policy necessary to bring a retaliatory discharge claim." Mem. Supp. Mot. Dismiss 5; *see also id.* at 6–7 (arguments related to the UL and IEC standards). Plaintiff does not respond to the arguments about the UL and IEC standards. *See generally* Resp. Mot. Dismiss, ECF No. 10. Accordingly, the Court considers only the general duty clause here. *See Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999) ("If [judges] are given plausible reasons for dismissing a complaint, they are not going to do the plaintiff's research and try to discover whether there might be something to say against the defendants' reasoning. An unresponsive response is no response."). The Court need not consider the import of the letter, which comments on lithium-ion batteries and is referenced in Plaintiff's complaint, Compl. 8, because it would not change the outcome of its decision.

"*specific* OSHA standard or regulation prohibiting [Defendant's] allege conduct." *Id.* at 7–8 (emphasis in original).

As an initial matter, Defendant presumes the general duty clause is vague. In various contexts, courts routinely find its meaning is clear. *See SeaWorld of Fla., LLC v. Perez*, 748 F.3d 1202, 1216 (D.C. Cir. 2014) ("Facial challenges to the general duty clause have been rejected . . . ."); *Donovan v. Royal Logging Co.*, 645 F.2d 822, 831 (9th Cir. 1981) ("[P]roblems [of fair notice] dissipate when we read the [general duty] clause as applying when a reasonably prudent employer in the industry would have known that the proposed method of abatement was required under the job conditions where the citation was issued."); *United States v. Pitt-Des Moines, Inc.*, 168 F.3d 976, 982 (7th Cir. 1999) ("[The general duty clause] requires employers to protect their own employees from obvious hazards even when those hazards are not covered by specific safety regulations imposed by [OSHA]."); *Caterpillar Inc. v. Occupational Safety & Health Rev. Comm'n*, 122 F.3d 437, 440 (7th Cir. 1997) (noting that a general duty clause violation requires "(i) the existence of a hazard likely to cause death or serious physical harm; (ii) the employer's recognition (*i.e.*, awareness) of the hazard; (iii) the availability of feasible means to abate the hazard; and (iv) the employer's failure to implement the feasible means of abatement."). The purpose of the clause is to require employers to eliminate preventable workplace hazards. *See Nat'l Realty & Const. Co. v. Occupational Safety & Health Rev. Comm'n*, 489 F.2d 1257, 1266–67 (D.C. Cir. 1973); *see also Pitt-Des Moines*, 168 F.3d at 982 ("This duty is considered general because it asks employers to protect employees from all kinds of serious hazards, regardless of the source."). And other courts, including Illinois appellate courts, have already found that removing eliminable workplace hazards is or advances a clearly mandated public policy, albeit typically in the context of reporting those hazards. *See, e.g.*,

*Gomez v. The Finishing Co.*, 861 N.E.2d 189, 197 (Ill. App. Ct. 2006) ("Preventing the discharge of an employee who reports occupational health hazards furthers the public policy of protecting the lives and property of Illinois citizens."); *Sherman v. Kraft Gen. Foods, Inc.*, 651 N.E.2d 708, 712 (Ill. App. Ct. 1995) ("[A]llowing an employee to report occupational health hazards, such as asbestos, without being discharged, furthers the public policy of protecting the lives and property of the citizens of the State of Illinois . . . ."); *see also Dunn v. Hamra Enterprises*, Case No. 20 C 04329, 2022 WL 4291028, at *7 (N.D. Ill. Sept. 16, 2022) (finding that the plaintiff's complaints to his employer about occupational hazards "concerned important matters of public policy . . . support[ing] a claim of retaliatory discharge"). The general duty clause also embodies this policy, and because it is a matter related to health and safety, it is of particular importance to the State. *See Dunn*, 2022 WL 4291028, at *7 ("Illinois courts are most likely to grant relief if the noncriminal regulations or statutes involved in retaliatory discharge suits involve health and safety." (quotation marks omitted)).

Although Defendant argues that, under *Turner*, the general duty clause is too attenuated from Plaintiff's specific conduct, the Court agrees with those courts that have found this interpretation of *Turner* stretches it too far. *See Harvey v. Chicago Transit Auth.*, Case No. 1-20-0973, 2022 WL 1449205, at *8 (disagreeing that precedent imposes a "minute requirement" to "rely on a statute or regulation that expressly addresses the specific conduct the plaintiff complained about that resulted in termination").[6] Plaintiff need not identify a granular "public

---

[6] The Court recognizes that unpublished Illinois appellate decisions are not precedential except in limited circumstances not applicable to this case. *See* Ill. Sup. Ct. R. 23(e). Where the Court cites to these cases, it does so only for their persuasive value. *See, e.g.*, *Skiba v. Illinois Cent. R.R. Co.*, Case No. 18 C 3381, 2021 WL 492900, at *4 n.3 (N.D. Ill. Feb. 10, 2021) (citing an unpublished Illinois appellate order "as persuasive authority, not binding precedent"); *United States v. Hillcrest Resort, Inc.*, Case No. 4:15-cv-04194-SLD-JEH, 2019 WL 6112840, at *2 (C.D. Ill. Nov. 18, 2019) (finding that although Illinois Supreme Court Rule 23 is not binding on federal courts, the Court could not give unpublished cases precedential effect and thus citing to those cases for their persuasive value only).

policy favoring vigorous battery testing," Reply 4. Rather, "[t]he test for determining if the complaint states a valid cause of action is whether the public policy clearly mandated by the cited provisions is violated by the plaintiff's discharge." *Barr*, 478 N.E.2d at 1357.

The Court finds that Plaintiff's allegations, taken as true, satisfy that test. Plaintiff alleges he is a battery expert who was hired to work on a battery-related project and complained that the batteries his team was required to use were volatile and could cause dangerous electrical shocks, fires, and explosions like the incident at the equipment show. *See generally* Compl. Plaintiff also alleges that his team's lack of familiarity with the technology was an additional hazard because dealing with emergency situations required unique protocol. *See id.* at 6, 7. Defendant forced Plaintiff's team to use technology he insisted was a time-bomb, then terminated him, rather than test the batteries, educate workers about their unique properties, or use safer technology. *See generally id.* Policy concerns would be thwarted if a subject-matter expert, hired by his employer for his expertise, was resigned to be a "yes man" after warning of occupational hazards within his expert area. *See Geary v. U.S. Steel Corp.*, 319 A.2d 174, 178–79 (Penn. 1974) ("[T]he potential for abuse of an employer's power of dismissal is particularly serious where an employee must exercise independent, expert judgment in matters of product safety . . . ."); *cf. Balla v. Gambro, Inc.*, 584 N.E.2d 104, 107–08 (Ill. 1991) (finding that the plaintiff, a general counsel discharged after telling the company president he would do "whatever was necessary" to stop sales of adulterated products, was discharged in contravention of public policy promoting health and safety but could not pursue his claim on other grounds). Ousting Plaintiff, under his theory of his case, allowed Defendant to cover up occupational hazards, stymying policy mandates that charge employers with actively eliminating those hazards from

the workplace. His allegations, if true, suggest a termination in violation of clearly mandated public policy, so he has stated a claim for retaliatory discharge.

## CONCLUSION

Accordingly, Defendant Deere & Company's motion to dismiss Count I, ECF No. 6, is DENIED; Defendant's motion for leave to file a reply, ECF No. 11, is GRANTED; and Plaintiff Daniel J. White's motion to cite additional authority, ECF No. 15, is GRANTED. Defendant is directed to file an updated answer within 14 days of this Order. *See* Fed. R. Civ. P. 12(a)(4)(A).

Entered this 23rd day of August, 2023.

                                                                                                         s/ Sara Darrow
                                                                                                         SARA DARROW
                                           CHIEF UNITED STATES DISTRICT JUDGE