UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

DANIEL J. WHITE,                               )
                                              )
        Plaintiff/Counter-Defendant,        )
                                              )
v.                                            )    Case No. 4:23-cv-04022-SLD
                                              )
DEERE & COMPANY,                              )
                                              )
        Defendant/Counter-Claimant.         )

<u>ORDER</u>

Plaintiff Daniel J. White asserts that Defendant Deere & Company ("Deere") violated Illinois common law because it discharged him in retaliation for raising safety concerns related to electric batteries. *See* Compl. 1–9, Not. Removal Ex. A, ECF No. 1-1. Before the Court is Deere's Motion for Partial Summary Judgment, ECF No. 32. For the reasons that follow, the motion is DENIED.

**BACKGROUND[1]**

By 2022, Deere had an ambitious goal: Design an autonomous battery-powered agricultural tractor. One iteration of this proposed tractor was the Carver project. Aaron Wetzel—a vice president at Deere—wanted to bring in external talent to lead the Carver project,

---

[1] At summary judgment, a court must "constru[e] the record in the light most favorable to the nonmovant." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Unless otherwise noted, this factual background is drawn from Deere's statement of undisputed material facts, Mem. L. Supp. Mot. Partial Summ. J. 1–23, ECF No. 33, White's response thereto and his statement of additional material facts, Resp. Mot. Partial Summ. J. 3–72, ECF No. 35, and Deere's reply thereto, Reply Mem. L. Supp. Mot. Partial Summ. J. 3–18, ECF No. 36. Deere argues that White's responses to its statement of undisputed material facts "blatantly violate" the Court's Civil Local Rules, pointing in part to the length of White's responses and his tendency to "present[] arguments unrelated to whether the fact is admitted." Reply Mem. L. Supp. Mot. Partial Summ. J. 1 n.1; *see also* Resp. Mot. Partial Summ. J. 27–47 (devoting twenty pages to dispute one fact and "apologiz[ing]" for the lengthy marshalling of evidence to dispute this fact"). To the extent they do not relate to disputation of the at-issue fact, White's responses are an improper attempt to circumvent the page limits imposed upon the argument section of summary-judgment briefing, such that the Court does not consider them. *See* Civil LR 7.1(D)(5).

which would have a distinct funding structure, a different approach to internal collaboration, and a goal of "engaging a targeted customer segment in learning what their needs were" as part of the design process. Pl.'s Excerpt Wetzel Dep. 9:23–12:7, Resp. Mot. Partial Summ. J. Ex. 4, ECF No. 35-1 at 25–36. Wetzel hired White—he began work on or around February 16, 2022 in the role of Chief Electrification Officer/Chief of Electrification. That role required White to report to Wetzel, lead the Carver team, and reach a targeted rollout date of 2025. White's offer letter specified that his employment was "at-will." Jan. 6, 2022 Letter from Wetzel & Junkins to White DEERE00003, Foong Decl. Ex. D, Mem. L. Supp. Mot. Partial Summ. J., ECF No. 33-4 at 15–18.

In or around February 2022, Deere finalized its acquisition of a majority stake of Kreisel Electric ("Kreisel"), a company that develops and manufactures batteries, including batteries which utilize immersion cooling technology. Deere intended to use Kreisel batteries across many different products, including the Carver tractor. Deere conducted extensive diligence into Kreisel's practices and assets prior to finalizing its acquisition. This diligence included reviewing safety test reports for specific battery models—like the Kreisel Battery Pack 63 ("KBP63")—which indicated that Kreisel batteries were compliant with certain international safety standards. Although the diligence did not reveal safety concerns associated with Kreisel's existing products or its immersion cooling technology, Kreisel batteries had previously caused two fires outside of Kreisel's facilities. Jennifer Preston—Vice President of John Deere Electric Power Train, a group within Deere related to John Deere Power Systems ("JDPS")—testified that Carver team members, including White, "didn't need to be informed" of these incidents. Pl.'s Excerpt Preston Dep. 52:14–22, Resp. Mot. Partial Summ. J. Ex. 5, ECF No. 35-2 at 1–10.

From the beginning, White made clear that he had doubts about using Kreisel batteries for the Carver project. He initially sought to leverage his connections from prior employment to set up meetings with companies like Panasonic. He was informed that conversations between Deere and Panasonic were already ongoing, and he was asked to clarify what he would request from Panasonic. He responded that he was aware that Preston's team was working to scale up production of Kreisel batteries and that he was hoping "to understand contingency plans or parallel plans should their [sic] be parallel paths [that Deere would be] interested in." June 6, 2022 Email from White to Handa et al., Mem. L. Supp. Mot. Partial Summ. J. Ex. 11, ECF No. 33-1 at 129–30. Preston forwarded this email to Pierre Guyot—Senior Vice President of JDPS—and Guyot sent an email to White wherein he stated: "To go direct to the point, Carver will have a Kreisel battery." June 8, 2022 Email from Guyot to White, Mem. L. Supp. Mot. Partial Summ. J. Ex. 11, ECF No. 33-1 at 129.

The next month, Guyot noted that he was still "hearing a lot of swirl on the battery for Carver," and stated that it "ha[d] to stop"—he reiterated: "[T]he battery in Carver will be a Kreisel battery." July 22, 2022 Email from Guyot to White & Scheff, Mem. L. Supp. Mot. Partial Summ. J. Ex. 13, ECF No. 33-1 at 134–35 (emphasis omitted). White remained unconvinced that Kreisel batteries were the proper solution and continued to explore other options for the Carver project—he felt that he could "[d]isregard" Guyot's views, at least in part because he thought that the relationship between JDPS and the Carver project was "undetermined at the time." Def.'s Excerpt White Dep. 84:13–24, 86:1–24, Yee Decl. Ex. A, Mem. L. Supp. Mot. Partial Summ. J., ECF No. 33-1 at 4–127. White sent to Wetzel a proposed response to Guyot's July 2022 email wherein White wrote that he was "not bought in" on using Kreisel batteries and that he believed that "the existing Kreisel solution and the Carver proposal

do not yield a successful market execution." July 22, 2022 Email from White to Wetzel, Mem. L. Supp. Mot. Partial Summ. J. Ex. 13, ECF No. 33-1 at 134.

According to Wetzel, White's concerns with the Kreisel batteries focused on certain performance metrics, such as "cost and density and the economics." Pl.'s Excerpt Wetzel Dep. 45:1–4. However, White was also concerned about safety. *See, e.g.*, July 22, 2022 Email from White to Wetzel ("The big [questions] are energy density and cost but safety and reliability are still a question as we had discussed."). White met with Preston in March 2022 to discuss a safety strategy for Deere. Later in June 2022, at Preston's suggestion, White traveled as part of a group to visit Kreisel's facilities in Austria. He returned from that trip with certain safety concerns. For example, he thought that the large quantity of O-rings—a common engineering component often utilized for sealing—in the batteries could cause leaking issues. He raised his concerns about Kreisel batteries, including safety issues, in separate meetings with, among others, Wetzel, Guyot, and Preston. White informed Guyot of his concerns about "fires and contamination of the dielectric fluid," providing Guyot with documentation of those concerns. Guyot Dep. 13:16–24, Resp. Mot. Partial Summ. J. Ex. 6, ECF No. 35-2 at 11–15. Wetzel assured him that Deere would not put an unsafe product on the market. Guyot and Preston listened to his concerns and directed him to meet with more technical employees who could more fully understand and address his concerns. White reached out to Mike Duffield—Battery Engineering Manager—via another engineer to ask about the "shock and vibe specifications" of the KBP63. June 24, 2022 Email from Duffield to Heimbuch, Mem. L. Supp. Mot. Partial Summ. J. Ex. 12, ECF No. 33-1 at 133. In an email to that other engineer cc'ing White, Duffield stated that the KBP63 was designed and tested according to an international standard and provided him with that battery's

"specific profiles," noting that other options for the Kreisel battery's design were available should the still undesigned Carver tractor require something different.  *Id.*

White was unsatisfied—he wanted to design and control a testing regimen for the KBP63 which would tell him more about Kreisel's technology generally and inform the design choices his team could make for the Carver tractor.  Preston and Guyot repeatedly informed him that normally JDPS, rather than a product team like the Carver team, was responsible for testing the batteries.  Preston thought that the battery could not be designed and tested without first designing the product, thereby defining the product's energy needs.  The record establishes that Wetzel shared the view that JDPS was responsible for battery testing but does not show whether Wetzel instructed White that he had to run testing through JDPS.  By July 2022, White knew that JDPS believed that they were responsible for testing, not his team.  Yet he and Preston remained at odds—Preston thought that the battery needed to be designed and tested based upon the Carver tractor's design, whereas White thought that his team could not design the Carver tractor without knowing more about the Kreisel batteries' capabilities and safety risks.  Essentially, White and Preston disagreed as to whether the Carver tractor was the chicken or the egg.

White began to pursue testing the KBP63 with FEV, a third-party company in Germany that did battery testing.  In August 2022, White informed Preston and Guyot that "the first pass KB[P]63 test plan ha[d] been developed," and would be refined by his team in collaboration with Duffield.  Aug. 11, 2022 Email from White to Preston, Mem. L. Supp. Mot. Partial Summ. J. Ex. 15, ECF No. 33-1 at 137.  Preston responded: "As you know we are responsible for testing, so let us know what the application requirements are and we'll build a test plan around it[.]"  Aug. 11, 2022 Email from Preston to White, Mem. L. Supp. Mot. Partial Summ. J. Ex. 16, ECF No. 33-1 at 138.  Guyot responded in similar fashion, noting that if the Carver team defined the test on

their own, that was "not the right approach."  Aug. 11, 2022 Email from Guyot to White, Mem. L. Supp. Mot. Partial Summ. J. Ex. 17, ECF No. 33-1 at 139.  White testified that he thought that because he was "running the project" that he could "do the testing where [he] need[ed] to do it."  Def.'s Excerpt White Dep. 113:4–14.  On August 19, 2022, White informed Lauren Foong—Human Resources ("HR") Business Partner—that a prototype battery was being shipped to the Carver team.

On August 31, 2022, Joachim Sobotzik—a "support person in Germany that [White] had put in like an innovation role," *id.* at 114:19–21—sent to Duffield notes that he had prepared from their "Carver Pre-Engineering Meeting" which articulated a series of proposed tests for the KBP63 based on data from FEV, Aug. 31, 2022 Email from Sobotzik to Duffield, Resp. Mot. Partial Summ. J. Ex. 15, ECF No. 35-4 at 1–3.  A few days later, Duffield informed Preston that he believed Sobotzik's test plan "came from [White]," that he was "not aligned and disagree[d] with the request to test batteries at FEV especially the abusive tests," and that he did not support White pushing Sobotzik "to start testing immediately."  Sept. 2, 2022 Email from Duffield to Preston, Resp. Mot. Partial Summ. J. Ex. 15, ECF No. 35-4 at 1.  That same day, Preston emailed White and Sobotzik, cc'ing Guyot and Udo Scheff, Director of Engineering, Mid & Utility, reiterating "that JDPS is responsible for battery design and testing, based on vehicle requirements."  Sept. 2, 2022 Email from Preston to Sobotzik & White, Resp. Mot. Partial Summ. J. Ex. 8, ECF No. 35-2 at 19–20.  She stated that JDPS did "not want to do 3rd party testing unless absolutely necessary (which is common with battery companies, to protect their own IP)" and that "[a]ny battery testing will be initiated by the JDPS team."  *Id.*

White was "floored."  Def.'s Excerpt White Dep. 126:8–14.  He thought that Preston had agreed in principle to third-party testing via FEV, yet "[s]he all of a sudden just said no after she

. . . saw" the specific tests White wanted to conduct  *Id.* at 126:10–14, 127:3–4.  White and Preston met to discuss this testing issue, and Preston sent herself an email recording her notes and thoughts from that meeting.  Preston noted that White felt that they "had an agreement that he and FEV would test KBP63," that she had given noncommittal responses to his statements about the proposed third-party testing which "he took . . . as agreement," and that was a "miscommunication on [her] part."  Sept. 8, 2022 Email from Preston to Preston, Resp. Mot. Partial Summ. J. Ex. 7, ECF No. 35-2 at 16–17.  Preston wrote that she liked White "as a person" and thought that he was working on maintaining his relationships with other stakeholders within Deere.  *Id.*  Otherwise, Preston was critical of White: (1) She thought that he believed that "[e]veryone (all functions) [we]re incompetent so [he] need[ed] to make all decisions related to Carver"; (2) He stated that the Carver team was "so weak"; and (3) He stated that "this Deere process of 'give requirements, design, test' [wa]s ridiculous and no one else in the world d[id] that," and that "he was brought in to fix that."  *Id.*  Her conclusion was that she thought that White had not "heard anything [she] said," and that "if someone asked [White] how the discussion with [her] went, he would [have said] something like 'I set [her] straight and let her know how things are going to work.'"  *Id.*

A few weeks later, White forwarded Preston's September 2, 2022 email—the one "shutting . . . down" the third-party testing—to Wetzel, and White described the prior discussions regarding testing, his desired test plan, why he thought testing was important, and his belief that Carver would not "succeed with the current trajectory of guarded information, emotion, and lack of collaboration."  Sept. 19, 2022 Email from White to Wetzel, Resp. Mot. Partial Summ. J. Ex. 8, ECF No. 35-2 at 18–19.  He also stated: "There is something going on

that is driving this behavior and I don't think [Preston] is the type that would let ego get in front of a great product." *Id.*

On October 19, 2022, Deere's competitor DeWalt demonstrated a new product involving an electric battery—the product caught fire. A Deere employee present at the event took a picture of the fire and sent it to colleagues within Deere, one of whom forwarded it to White and Wetzel. Wetzel subsequently received the following text from White:

> Subject-->Kreisel battery testing. After seeing the dewalt go up in flames it stresses the need to do testing on the kreisel battery. There are rumors swirling that JDPS has started testing and getting poor results and thus not wanting us to test. Are we walking into a situation like DEWALT?

Oct. 19, 2022 Text from White to Wetzel, Resp. Mot. Partial Summ. J. Ex. 12, ECF No. 35-3 at 29. White also sent an email about the DeWalt fire to his team, warning them that the relevant battery technology was "no joke" and urging them to "Be Safe." Oct. 19, 2022 Email from White to Muller et al., Resp. Mot. Partial Summ. J. Ex. 11, ECF No. 35-3 at 25.

Wetzel contacted Foong and informed her that White had sent him that text about the DeWalt fire, relaying the text from White verbatim. They then exchanged the following messages:

> Wetzel: One of our competitors [sic] machines caught on fire today at their launch event…
> Foong: Is this in [White's] scope?
> Wetzel: No.
> Foong: Isn't it [Preston]'s team that does the testing?
> Wetzel: No. This is turf. Dave knight.[2]
> Foong: Liked "No. This is turf. Dave knight."
> Foong: [White] needs to stay in his lane and stick to facts. Not always assume the worst! We at [Deere], we are also smart… [emoji]
> Foong: We will always do what's right!
> Wetzel: Exactly!

---

[2] Wetzel testified that he stated that the DeWalt issue was not within White's scope because White was not "responsible for the design or the development of the battery system—of the battery packs." Pl.'s Excerpt Wetzel Dep. 35:11–21. Low-voltage batteries like the at-issue DeWalt battery were handled by a different division within Deere, namely, Turf Systems, of which Dave Knight was a part. *Id.* at 36:22–37:8.

Oct. 19, 2022 Texts Between Wetzel & Foong, Resp. Mot. Partial Summ. J. Ex. 10, ECF No. 35-3 at 13. Foong later testified that she was unaware that: (1) White had communicated with his superiors about the DeWalt fire, (2) there was tension between White and Preston regarding who would be responsible for testing the Carver tractor's batteries, and (3) White had texted Wetzel about the Kreisel battery and his desire to get it tested for safety reasons. She also testified that she was unaware that White was alleging that rumors were swirling about JDPS's poor test results and that those results were why JDPS did not want White to conduct testing on the Kreisel batteries. In the following days and on Wetzel's instruction, Foong met with White's supervisees to document their negative feedback about White and his performance as a leader. On October 31, 2022, White was informed that he had been terminated.

Deere emphasizes a distinct yet overlapping set of events. First, White frequently clashed with other senior Deere employees. In addition to the disputes with Preston and Guyot regarding battery testing, he got into a heated conversation with Scheff which was so disruptive that witnesses called Deere's Compliance Hotline to report it. One of White's supervisees described the relationship with Scheff as "non[-]functioning" and another stated that he had "burnt th[e] bridge" with Scheff's team of engineers. Oct. 28, 2022 Email from Foong to Eley, Foong Decl. Ex. A, Mem. L. Supp. Mot. Partial Summ. J., ECF No. 33-4 at 5–8. His relationship with Preston was described as "questionable," and his relationship with Guyot as "tolerable," *id.*, although Guyot himself described their relationship as "low to average" by the time White was terminated, Guyot Dep. 54:2–5. White criticized Wetzel to outside consultants—for example, he requested that one consultant keep confidential his opinion that Wetzel was not "going to be there on the hard stuff." Sept. 20, 2022 Text from White to Brahmandam, Mem. L. Supp. Mot. Partial Summ. J. Ex. 18, ECF No. 33-1 at 140–41. Earlier,

he had asked that consultant to "do some recon" on Duffield because he had "not been impressed" by Duffield's work in such a "critically important" role. May 24, 2022 Text from White to Brahmandam, Mem. L. Supp. Mot. Partial Summ. J. Ex. 9, ECF No. 33-1 at 128. He refused to accept the decision of Deere's relocation consultants and senior HR personnel regarding reimbursement of certain moving expenses. And as described above, his emails to Wetzel about Preston "shutting [the third-party testing] down" demonstrate that he thought that his working relationships with his supervisory peers were at risk of deteriorating, thereby risking the success of the Carver project. Sept. 19, 2022 Email from White to Wetzel.

Second, many of White's supervisees did not think that he was a good leader or that he was leading the Carver team to success. Wetzel testified that White had relationship problems with "[n]early all" of the people he worked with on a regular basis, Def.'s Excerpt Wetzel Dep. 74:24–75:3, Yee Decl. Ex. C, Mem. L. Supp. Mot. Partial Summ. J., ECF No. 33-1 at 164–85, and that Wetzel regularly "receiv[ed] feedback from various folks across the organization" regarding White's "performance, or his behavior in meetings," *id.* at 28:13–15. Foong similarly averred that "[t]hroughout Mr. White's tenure, various individuals on his team reached out to [her] to report issues that they had with his leadership and ability to work with others." Foong Decl. ¶ 5, ECF No. 33-4 at 1–4. On September 19, 2022, Foong texted Wetzel to coordinate a time to discuss feedback regarding the Carver team dynamic that Foong had just received from White's administrative assistant which made Foong "a little concerned." Sept. 19, 2022 Text from Foong to Wetzel, Resp. Mot. Partial Summ. J. Ex. 10, ECF No. 35-3 at 4.

Following a contentious meeting between White and his team on October 20, 2022, Foong texted Wetzel that multiple people had reached out to her "asking for guidance on how to handle the chaos and work with [White]." Oct. 20, 2022 Text from Foong to Wetzel, Resp. Mot.

10

Partial Summ. J. Ex. 10, ECF No. 35-3 at 15.  On October 21, one of White's supervisees sent Foong an email describing the "lack of trust, transparency, and overall, a lack of an environment of collaboration" engendered by White's hostility to pushback and his preference to work with outside consultants instead of his team within Deere.  Oct. 21, 2022 Email from Cobie to Foong, Resp. Mot. Partial Summ. J. Ex. 14, ECF No. 35-3 at 37–38.  The extensive complaints which Foong compiled from White's supervisees are best summarized by one of White's supervisees stating: "[H]is issue is his [l]eadership skills, that is clearly tearing this team apart."  Oct. 28, 2022 Email from Foong to Eley.

Finally, White was recorded drinking a beer during a work meeting.  *See* Video Recording: Received by Foong from Muller on Oct. 14, 2022, Foong Decl. Ex. E, ECF No. 33-4 at 19.  On September 27, 2022, Foong informed her supervisor that one of White's supervisees reported that White was seen "drinking beers when he works from home" and that she intended to ask White "to refrain, especially when on work calls during the workday."  Sept. 27, 2022 Text from Foong to Butler, Resp. Mot. Partial Summ. J. Ex. 10, ECF No. 35-3 at 22.  Foong and White subsequently met to discuss his drinking, and Foong informed her supervisor that White "denie[d] 'crushing beers' during work hours" but "he said that he might have had one late in the day, on a late call."  Sept. 28, 2022 Text from Foong to Butler, Resp. Mot. Partial Summ. J. Ex. 10, ECF No. 35-3 at 24.  Wetzel also spoke with White about drinking on the job and he testified that White told him that it "[w]on't happen again."  Pl.'s Excerpt Wetzel Dep. 91:18–92:4 (quotation marks omitted).  However, it did happen again.  During a virtual meeting on October 14, 2022, White was recorded by one of his supervisees drinking a Miller Lite while conducting business for Deere.  That supervisee sent the recording to Foong, who in turn sent it to Wetzel.

11

According to Wetzel, this was the "straw that broke the camel's back" and he decided after viewing that recording that White needed to be terminated.  *Id.* at 18:14–21:3.

White sued Deere in state court on December 27, 2022, alleging in part that Deere retaliatorily discharged him for raising safety concerns about the Kreisel batteries.  Compl. 1–9.  Deere removed this case to federal court on February 3, 2023, Not. Removal, ECF No. 1, and has asserted alternative counterclaims against White for either breach of contract or unjust enrichment, Am. Answer & Countercls. 24–30, ECF No. 21.  The Court denied Deere's motion to dismiss White's claim of retaliatory discharge, finding that White plausibly alleged that his discharge violated a clear mandate of Illinois's public policy.  *See generally* Aug. 23, 2023 Order, ECF No. 19.  Deere now moves for summary judgment on White's claim of retaliatory discharge and White opposes that motion.[3]

## DISCUSSION

### I.    Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant in a summary judgment motion bears the initial burden of production; it must point the court to the materials in the record that "demonstrate the absence of a genuine issue of material fact" for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the nonmovant bears the ultimate burden of persuasion on a particular issue, however, the movant can meet its initial burden by showing "that there is an absence of evidence to support the

---

[3] White moved for summary judgment on Count II of his Complaint, which asserted that a retention agreement between himself and Deere was unenforceable.  *See generally* Mot. Summ. J. Count II, ECF No. 31.  Upon realizing that satisfaction clauses in employment contracts are generally enforceable under Illinois law due to an implied covenant of good faith, he conceded that his motion should be denied.  Reply Mot. Summ. J. Count II 1, ECF No. 37.  The Court denied that motion.  Dec. 3, 2024 Text Order.

nonmov[ant]'s case." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (quotation marks omitted). Once the movant discharges its initial burden, the burden shifts to the nonmovant to "make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

The court must construe the record in the light most favorable to the nonmovant, *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003), "resolving all factual disputes and drawing all reasonable inferences in favor of [the nonmovant]," *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). The nonmovant "is not entitled to the benefit of inferences that are supported by only speculation or conjecture." *Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (quotation marks omitted). "[T]he mere existence of *some* alleged factual dispute is insufficient to defeat a motion for summary judgment," *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015) (quotation marks omitted), as "there must be evidence on which the jury could reasonably find for the [nonmovant]," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## II. Analysis

The parties agree that Illinois law applies to White's claim of retaliatory discharge. *See* Mem. L. Supp. Mot. Partial Summ. J. 24–25, ECF No. 33; Resp. Mot. Partial Summ. J. 72–73, ECF No. 35. "It has long been the general rule in Illinois that a noncontractual or at-will employee may be discharged by his or her employer at any time and for any reason." *Michael v. Precision All. Grp., LLC*, 21 N.E.3d 1183, 1188 (Ill. 2014). The Illinois Supreme Court established a "narrow exception" to this general rule by recognizing a common law cause of action for retaliatory discharge. *Id.* (citing *Kelsay v. Motorola, Inc.*, 384 N.E.2d 353 (Ill. 1978)). The cause of action has been expanded beyond its original scope of workers' compensation

issues to cover discharges implicating a "clear mandate of public policy," *Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876, 878 (Ill. 1981) (quotation marks omitted), such as whistleblowing, *Jacobson v. Knepper & Moga, P.C.*, 706 N.E.2d 491, 493 (Ill. 1998).

Retaliatory discharge requires an employee to prove that "(1) the employer discharged the employee, (2) in retaliation for the employee's activities, and (3) that the discharge violates a clear mandate of public policy." *Turner v. Mem'l Med. Ctr.*, 911 N.E.2d 369, 374 (Ill. 2009); *Perez v. Staples Cont. & Com. LLC*, 31 F.4th 560, 571 (7th Cir. 2022) (quoting *Turner*, 911 N.E.2d at 374). White was informed by Deere on October 31, 2022 that he had been terminated, *see* Def.'s Excerpt White Dep. 314:20–22, and Deere does not contest whether White's discharge violated a clear mandate of public policy, *see, e.g.*, Resp. Mot. Partial Summ. J. 73. In other words, resolution of Deere's motion for partial summary judgment turns solely upon the second element—whether White was discharged in retaliation for his activities.

"The requirement that the discharge be in retaliation for plaintiff's activities requires that a plaintiff establish a causal relationship between the employee's activities and the discharge." *Michael*, 21 N.E.3d at 1188. "[T]he plaintiff has the burden of affirmatively show[ing] that the discharge was primarily in retaliation for his exercise of a protected right." *Walker v. Ingersoll Cutting Tool Co.*, 915 F.3d 1154, 1157 (7th Cir. 2019) (second alteration in original) (quotation marks omitted); *see also Michael*, 21 N.E.3d at 1189 ("[T]he burden rests on plaintiff to prove each of the elements of the cause of action."). "[C]ausation may be demonstrated by circumstantial evidence." *Hubert v. Bd. of Educ. of City of Chi.*, 169 N.E.3d 831, 838 (Ill. App. Ct. 2020); *see also Reid v. Neighborhood Assistance Corp. of Am.*, 749 F.3d 581, 587 (7th Cir. 2014) (noting that "the evidence will typically be circumstantial" for claims of retaliatory discharge). Merely showing a "sequential connection" is insufficient. *Walker*, 915 F.3d at 1157

14

(quotation marks omitted).  Similarly, "but-for causation is necessary but not sufficient to prove the causation element of a retaliatory-discharge claim." *Hillmann v. City of Chicago*, 834 F.3d 787, 794 (7th Cir. 2016).  "[T]he ultimate issue to be decided is the employer's motive in discharging the employee." *Hartlein v. Ill. Power Co.*, 601 N.E.2d 720, 730 (Ill. 1992).  A court "looks to the record as a whole to determine whether a jury could reasonably infer retaliation." *Monroe v. Capstone Logistics, LLC*, No. 4:20-cv-04107-SLD-JEH, 2021 WL 3711171, at *10 (C.D. Ill. Aug. 20, 2021) (citing *Reid*, 749 F.3d at 587).

Illinois has explicitly rejected the burden-shifting framework often used for retaliation claims asserted under federal law.  *See Clemons v. Mech. Devices Co.*, 704 N.E.2d 403, 407–08 (Ill. 1998) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)).  Instead, "[t]he allocation of proof in a retaliatory discharge claim is reviewed using traditional tort analysis." *Holland v. Schwan's Home Serv., Inc.*, 992 N.E.2d 43, 76 (Ill. App. Ct. 2013). Illinois's determination that a plaintiff must satisfy traditional tort principles to maintain a cause of action for retaliatory discharge is a "substantive judgment" such that "when a retaliatory discharge case governed by Illinois law is litigated in a federal court, the federal court must apply the standard of the state law to a motion for summary judgment, and not the federal standard, because the standards are materially different and the difference is rooted in a substantive policy of the state." *Gacek v. Am. Airlines, Inc.*, 614 F.3d 298, 303 (7th Cir. 2010). A federal court may not reflexively import generalized federal standards for analyzing whether an adverse employment action was retaliatory—Illinois's substantive law controls.  *See Staples Cont. & Com. LLC*, 31 F.4th at 571.

Under Illinois law, "an employer is not required to come forward with an explanation for the employee's discharge, although an employer may choose to offer a reason if it desires."

15

*Michael*, 21 N.E.3d at 1189.  "The element of causation is not met if the employer has a valid

basis, which is not pretextual, for discharging the employee." *Hartlein*, 601 N.E.2d at 728.

However, "[i]f an employer provides a reason for the employee's dismissal, that does not

automatically defeat a retaliatory discharge claim." *Michael*, 21 N.E.3d at 1189.  The trier of

fact's role is crucial—"if an employer chooses to come forward with a valid, nonpretextual basis

for discharging its employees *and the trier of fact believes it*, the causation element required to

be proven is not met." *Id.* (emphasis added) (quotation marks omitted).  "[T]he issue of an

employer's true motive in terminating an employee is a question of material fact, not normally

suitable for resolution on summary judgment." *Hubert*, 169 N.E.3d at 837; *see also Turner*, 911

N.E.2d at 375 n.1; *Zuccolo v. Hannah Marine Corp.*, 900 N.E.2d 353, 359 (Ill. App. Ct. 2008).

"If, at the summary judgment stage, a genuine dispute as to whether the employee's or the

employer's explanation was the true reason for the termination exists, it is for the trier of fact to

decide between the competing explanations." *Monroe*, 2021 WL 3711171, at *10.

 *Hubert* is particularly instructive on this point.  There, the employee's "colleagues that

submitted evidence in th[e] case resoundingly stated that he was difficult to work with and that

he made their jobs stressful" because he continued to condescend to his colleagues and clash

with them despite explicit instructions to the contrary.  *Hubert*, 169 N.E.3d at 838.  The

employer argued that it was entitled to summary judgment because it had mustered a convincing

case that the employee was "terminated for legitimate, nonretaliatory reasons—insubordination

and inappropriate behavior toward coworkers." *Id.* at 836–37.  The employee maintained that he

was retaliated against for reporting to outside entities that his employer was being defrauded by

vendors—he was fired three weeks after he went outside his department to report the fraud. *Id.*

at 837.  The *Hubert* court found that there was a genuine dispute of material fact regarding

pretext because the employee averred that his boss "stated his displeasure" with the employee going outside his department and that "might have created the impression that [the employee's boss] could not manage his department and, thus, [the boss] was threatened." *Id.* at 838–39.  It further found that summary judgment for the employer was improper, describing the issue as "a classic case of both sides presenting evidence to support their positions and advancing a narrative that could be true." *Id.* at 837.  A trier of fact had to decide "the issue of an employer's true motive in terminating an employee," because "[a] jury could believe the narrative advanced by [the employee], and that narrative [wa]s supported by at least *some* evidentiary facts and the inferences that could be drawn therefrom." *Id.* at 837–38.  At bottom, even if an employer amply supports their legitimate reasons for terminating an employee, summary judgment is inappropriate if a reasonable finder of fact could believe that the employer's true motive was retaliatory.

At trial, White would need to convince the trier of fact that each of Deere's reasons for his termination is unworthy of belief and that a retaliatory motive was *the* proximate cause for his discharge.  *See Matros v. Commonwealth Edison Co.*, 136 N.E.3d 83, 107–08 (Ill. App. Ct. 2019); *Wallace v. Cont'l Tire the Americas LLC*, No. 21-cv-00562-SPM, 2022 WL 672467, at *2 (S.D. Ill. Mar. 7, 2022); *Baptist v. Ford Motor Co.*, No. 13 C 8974, 2018 WL 1519153, at *2– 3 (N.D. Ill. Mar. 28, 2018).  But at this stage, solely demonstrating the existence of a legitimate, nondiscriminatory reason for termination does not automatically entitle an employer to summary judgment.  *See Michael*, 21 N.E.3d at 1189.  Instead, the inquiry is two-fold: (1) whether White has mustered evidence sufficient to allow a trier of fact to reasonably infer that Deere's decision to terminate White was improperly motivated, *i.e.*, motivated by White continuing to raise his concerns about the Kreisel batteries' safety; and (2) whether there are genuine issues of material

17

fact which, if resolved in White's favor, would allow a reasonable trier of fact to infer that Deere's proffered reasons for White's termination were pretextual, *i.e.*, to disbelieve Deere's narrative that White was fired because of his clashes with his supervisory peers, his inability to lead his supervisees, or his drinking on the job.

Returning to the facts of this case, the Court first addresses the parties' dispute regarding when the decision to terminate White was made. Pinning down the date that the decision to terminate an employee was made is often crucial in retaliation cases—an employer's decision could not have been motivated by an employee's activities or intent to engage in those activities if the decisionmaker was unaware of those facts when it decided to terminate the employee. *See Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 773 (7th Cir. 2012) ("Factual support that the employer was informed or in some way found out about the plaintiff's intent to [engage in protected activity] is essential to a retaliatory discharge action." (quotation marks omitted)). Deere asserts that Wetzel made the decision to terminate White on October 14, 2022, the day on which White was recorded drinking beer during a work meeting. *See* Mem. L. Supp. Mot. Partial Summ. J. 18. Deere argues that certain events which occurred after October 14 are therefore irrelevant because they could not have influenced Wetzel's earlier decision. *See, e.g.*, Reply Mem. L. Supp. Mot. Partial Summ. J. 22. However, the only evidence to which Deere points to support October 14 as the date when Wetzel decided to terminate White is Wetzel's testimony that he decided to fire White after viewing the recording of White drinking beer. *See* Mem. L. Supp. Mot. Partial Summ. J. 18 (citing Def.'s Excerpt Wetzel Dep. 18:14–20:17). And Wetzel testified that he did not "remember specifically the date" when he decided to terminate White, Def.'s Excerpt Wetzel Dep. 18:14–16, nor did he "recall exactly" when he saw that

recording, *id.* at 19:17–21.  This testimony does not conclusively establish that Wetzel decided to terminate White on October 14.

Wetzel came closest to articulating a specific date for his decision when discussing text messages that he and Foong exchanged on October 18, asserting that he "had already decided that [White] was done" by that point.  Pl.'s Excerpt Wetzel Dep. 32:6–7.  But in those same texts, Foong indicates that the decision was not yet final by using the phrase "if we walk away," and states that Wetzel's boss did not want him to "rush the process" of firing White.  Oct. 18, 2022 Texts Between Wetzel & Foong, Resp. Mot. Partial Summ. J. Ex. 10, ECF No. 35-3 at 10–11.  Viewing the evidence in White's favor, a reasonable trier of fact could infer that the decision to fire White had not yet been finalized by October 18.  Therefore, the undisputed record shows only that the decision to terminate White was made at some point between October 14 and October 31 of 2022—a finder of fact would need to decide what to believe regarding the exact date of White's termination decision.

Turning to White's evidence of Deere's improper motivation, it is undisputed that White raised his concerns about the Kreisel batteries' safety and potential to cause fires to, among others, Wetzel, Preston, and Guyot.  Pl.'s Excerpt White Dep. 91:18–92:23, Resp. Mot. Partial Summ. J. Ex. 1, ECF No. 35-1 at 1–19; Pl.'s Excerpt Preston Dep. 32:4–8; Guyot Dep. 13:4–24, 15:20–16:6.  White believed that Preston had agreed to allowing a third party to run tests upon the KBP63, Pl.'s Excerpt White Dep. 158:4–11, and Preston contemporaneously recorded that she initially had not explicitly told White that third-party testing was off the table, Sept. 8, 2022 Email from Preston to Preston.  Preston rejected the idea of testing with a third party after seeing a detailed proposal of the tests that White wanted to run, and White informed Wetzel of Preston's rejection of his proposal.  Sept. 19, 2022 Email from White to Wetzel.  Around this

time, White's team was working in physical proximity to a prototype Kreisel battery.  *See* Aug.

19, 2022 Email from White to Foong & Panjwani , Resp. Mot. Partial Summ. J. Ex. 3, ECF No.

35-1 at 24; Pl.'s Excerpt White Dep. 160:11–161:8.  After DeWalt's product caught fire in

October, White again raised the need to conduct testing on the Kreisel batteries and asserted that

there were rumors that JDPS was getting poor results from its tests.  Oct. 19, 2022 Text from

White to Wetzel.  He tied the rumored test results to Preston's earlier refusal to allow third-party

testing under his control.  *Id.*  He concluded by asking if his team was at risk of being exposed to

a similar fire.  *See id.* ("Are walking into a situation like DEWALT?").  Wetzel forwarded that

text to Foong, who stated that White "need[ed] to stay in his lane and stick to facts."  Oct. 19,

2022 Texts Between Wetzel & Foong.  Wetzel responded: "Exactly!"  *Id.*

      A trier of fact must decide what is the proper inference to draw from Wetzel's statement

of "Exactly!" as the record as a whole could support both parties' narratives.  Wetzel testified

that his statement of "Exactly!" was in response to Foong's statement that "[Deere] will always

do what's right!" and that he meant to express his view that Deere "would never bring a product

to market that would catch fire like that."  *Id.* at 38:10–19.  A reasonable trier of fact could

believe this explanation, recalling that Wetzel informed White of his belief that Deere would not

put an unsafe product on the market when White raised safety concerns regarding the Kreisel

batteries.  Wetzel Decl. ¶ 9, Mem. L. Supp. Mot. Partial Summ. J., ECF No. 33-2.

      On the other hand, a reasonable finder of fact could also infer that Wetzel was agreeing

with Foong's statement that White "need[ed] to stay in his lane and stick to facts."  Oct. 19, 2022

Texts Between Wetzel & Foong.  Wetzel knew that Preston had rejected White's desired tests,

*see* Sept. 19, 2022 Email from White to Wetzel, and when White raised the issue of testing

again, Wetzel forwarded White's text to the only other person who, aside from legal counsel,

Deere stated was consulted in the termination decision—Foong. Pl.'s Excerpt Wetzel Dep. 17:15–18:11. In the days immediately following those texts, Foong acted upon Wetzel's instruction to "gather[] all of the information . . . into one location" to support White's termination. Pl.'s Excerpt Wetzel Dep. 21:4–13; *see also* Oct. 28, 2022 Email from Foong to Eley (showing that Foong held meetings with White's supervisees to discuss his performance as a leader on October 20, 21, and 24). As will be further explored below, Foong denied any knowledge of White's activities related to the Kreisel batteries' safety, despite the contrary contemporaneous evidence demonstrating that White informed her of his concerns about prototype batteries generally, *see* Aug. 19, 2022 Email from White to Foong & Panjwani, and that she knew about the DeWalt fire specifically, *see* Oct. 19, 2022 Texts Between Wetzel & Foong. Taking this circumstantial evidence as a whole, a reasonable trier of fact could infer that Wetzel's response of "Exactly!" was actually expressing agreement with Foong's statement that White "need[ed] to stay in his lane," and that Wetzel therefore harbored an improper motive to silence White's incessant complaints about the Kreisel batteries' risks. Oct. 19, 2022 Texts Between Wetzel & Foong. A trier of fact could reasonably conclude that White mustered sufficient evidence that the decision to terminate him was improperly motivated. *See Hubert*, 169 N.E.3d at 838 (finding that summary judgment was improper where "[a] jury could believe the narrative advanced by [the employee], and that narrative [wa]s supported by at least *some* evidentiary facts and the inferences that could be drawn therefrom").[4]

---

[4] White asserts that a retaliatory motive could also be inferred because Preston was aware of the previous fires and rejected the third-party testing to conceal safety flaws in the Kreisel batteries. *See* Resp. Mot. Partial Summ. J. 80–84. That inference is unreasonable for two reasons. First, Preston stated at the time that she was shutting down the testing to protect Deere's intellectual property. *See* Sept. 2, 2022 Email from Preston to Sobotzik & White. White asserted that Preston shut down the testing to conceal safety issues instead, *see* Pl.'s Excerpt White Dep. 158:7–15, but that assertion is simply speculation on his part, *see, e.g.*, *Fox v. Adams & Assocs., Inc.*, 166 N.E.3d 772, 789 (Ill. App. Ct. 2020) ("Where a plaintiff offers merely her own speculation to substantiate her claim that an employer sought to retaliate against her, summary judgment may be appropriate."); *cf. Argyropoulos v. City of Alton*, 539 F.3d 724, 737 (7th Cir. 2008) (noting in a Title VII retaliation case that "speculation will not withstand summary

Deere advances many arguments for why it is still entitled to summary judgment, none of which are persuasive. First, Deere advances three related points regarding the October 19 texts between Foong and Wetzel about the DeWalt fire and Foong's role generally: (i) Foong was an HR employee, not a technical employee, so she would not have any reason to retaliate against White; (ii) Foong was not dishonest in her deposition; and (iii) even if Foong was dishonest, she was not the decisionmaker, so her testimony is ultimately immaterial. While a trier of fact could be convinced by these points, none are sufficient to conclude as a matter of law that it would be unreasonable to consider evidence related to Foong to be probative of an improper motive on Wetzel's part. Deere's other arguments relate to: (2) direct evidence of a retaliatory motive; (3) Deere employees' reactions to White's safety concerns; (4) Deere's assertedly valid and non-pretextual reasons for terminating White; and (5) whether White's intervening misconduct severed any causal connection between his activities and termination. The Court first addresses the arguments related to Foong and takes up the other arguments in turn.

Beginning with Deere's initial point about Foong, Deere questions why Foong—"an HR representative with no knowledge of battery safety"—would be motivated to retaliate against White. Reply Mem. L. Supp. Mot. Partial Summ. J. 21–23. Foong testified that she was not involved in "meetings where they got into technical details." Pl.'s Excerpt Foong Dep. 64:5–19, Resp. Mot. Partial Summ. J. Ex. 9, ECF No. 35-2 at 21–25. She also had no opinion as to whether White was raising safety concerns when he asked, "Are we walking to a situation like DEWALT?" Oct. 19, 2022 Text from White to Wetzel, testifying that "there's a lot to that

judgment" where the plaintiff-employee's "argument rest[ed] on speculation that the [defendant]'s employees lied to conceal their true motives"). Second, there is no evidence connecting Preston's speculatively improper motive to the decisionmaker, Wetzel. White does not dispute Wetzel's testimony that he was unaware of the two occasions when Kreisel batteries caused fires, *see* Pl.'s Excerpt Wetzel Dep. 38:20–39:11, nor Preston's testimony that she was not involved in discussions related to White's termination, *see* Pl.'s Excerpt of Preston Dep. 173:7–175:11. White has failed to muster evidence that Preston's rejection of third-party testing is itself probative of an improper retaliatory motive on Wetzel's part.

question," Def.'s Excerpt Foong Dep. 67:16–68:5, Reply Mem. L. Supp. Mot. Partial Summ. J. Ex. D, ECF No. 36-1 at 40–47. However, Foong's lack of technical knowledge is not dispositive. For example, in *Hubert*, the supervisor's potentially improper motive was not tied to the merits of the employee's concerns about vendor fraud. Instead, the believably improper motive came from the impression created by the employee's decision to complain outside of his department about the fraud, namely that the supervisor could not manage his department. *Hubert*, 169 N.E.2d at 838–39. In other words, the supervisor's motive was based upon process, not substance. One need not understand why the wheel is squeaking to grow resentful of its incessant din, and here Foong would not need to know anything about battery safety to develop an improper motive regarding White's repeated invocation of battery safety.

Next, Deere asserts that Foong was not dishonest in her deposition testimony. Reply Mem. L. Supp. Mot. Partial Summ. J. 12–14, 16–17. Foong denied knowing whether White had communicated about the DeWalt fire with his superiors, Pl.'s Excerpt Foong Dep. 62:14–18, but she had been forwarded the text about the DeWalt fire that White had sent to Wetzel, *see* Oct. 19, 2022 Texts Between Wetzel & Foong. She denied being aware that "White was engaged in numerous conversations with Jenny Preston and others, including Aaron Wetzel and Pierre Guyot, about testing the batteries that his Carver Project was supposed to use in their project," Pl.'s Excerpt Foong Dep. 63:16–64:2, yet her response to Wetzel when he informed her that White wanted to test the batteries following the DeWalt battery fire was to ask whether this issue was within White's scope and—without prompting—raise the idea that Preston's team was responsible for testing, not White's, *see* Oct. 19, 2022 Texts Between Wetzel & Foong. Finally, when asked directly whether she was "aware that on October 19, 2022, Dan White texted Aaron Wetzel's mobile about the Kreisel battery and his desire to get it tested for safety reasons," she

denied being aware of this fact.  Pl.'s Excerpt Foong Dep. 66:15–20.  Deere asserts that this

testimony was not dishonest because White's text "did not explicitly say that he wanted to test

the Kreisel battery for safety reasons."  Reply Mem. L. Supp. Mot. Partial Summ. J. 13–14

(quotation marks omitted).  This distinction is hard to draw when viewed in light of White's

email to Foong describing prototype batteries as "dangerous goods by their nature," and the fact

that White's team was working in physical proximity to a prototype Kreisel battery.  Aug. 19,

2022 Email from White to Foong & Panjwani; Pl.'s Excerpt White Dep. 160:11–161:8.  The

Court cannot conclude as a matter of law that it would be unreasonable for a trier of fact to find

Foong's denials that she was aware of White's activities to be dishonest.

Turning to its last point about Foong, Deere posits that evidence related to Foong is

immaterial, characterizing her as a bystander who had "no role in Mr. Wetzel's decision" to

terminate White.  *See* Reply Mem. L. Supp. Mot. Partial Summ. J. 21–23.  However, viewing the

record in White's favor, Foong was much more than just an HR functionary.  In its interrogatory

responses, Deere stated that she was consulted in the decision to terminate White.  Pl.'s Excerpt

Wetzel Dep. 17:15–18:11.  When Wetzel made his decision that White needed to be terminated,

Foong was the person Wetzel told of that decision.  *Id.* at 18:23–19:6.  After they exchanged

texts about White's renewed call for testing following the DeWalt fire, Wetzel tasked her with

assembling a documentary record to support White's termination.  *Id.* at 21:4–13.  She was a

conduit by which negative feedback about White was passed to Wetzel, and she was the one who

met with White's supervisees in the following days to document their negative feedback about

him.  *See, e.g.*, Oct. 28, 2022 Email from Foong to Eley.  She and Wetzel were the people who

informed White that he was terminated.  Def.'s Excerpt White Dep. 303:22–304:6.  She may not

have been the one to decide that White should be terminated, but she was involved for every step in that process.

Deere points out that in the Title VII context, the animus of a non-decisionmaker is "usually ineffective to show pretext where . . . there is a non-retaliatory reason for the employer's decision." Reply Mem. L. Supp. Mot. Partial Summ. J. 22 (quoting *Metzger v. Ill. State Police*, 519 F.3d 677, 682 (7th Cir. 2008)). But unlike *Metzger*, here there is evidence from which a reasonable trier of fact could infer that the decisionmaker agreed with the non-decisionmaker's disapproval of the employee's protected activity, namely Wetzel's response of "Exactly!" to Foong's statement that White "need[ed] to stay in his lane and stick to facts." *See* Oct. 19, 2022 Texts Between Wetzel & Foong. In sum, Foong's texts and testimony are properly considered as pieces of circumstantial evidence that could support a reasonable inference that Wetzel's decision to terminate White was improperly motivated.

Moving from Deere's related points about Foong's role to its second argument for why it is entitled to summary judgment, Deere asserts that there is no direct evidence of a retaliatory motive. Mem. L. Supp. Mot. Partial Summ. J. 25–26. White testified that no one at Deere told him that he was terminated because he was "voicing safety concerns." Def.'s Excerpt White Dep. 168:23–169:2. But such direct evidence is rare because "an employer will generally know better than to explicitly reveal that a discharge is motivated by the employee's protected complaints," *Reid*, 749 F.3d at 587, and ultimately unnecessary because "causation may be demonstrated by circumstantial evidence," *Hubert*, 169 N.E.3d at 838. The absence of a smoking gun is neither unusual nor dispositive.

Relatedly, Deere argues that the absence of direct evidence means that White is relying solely upon suspicious timing, noting that "temporal proximity, without more, does not create a

25

genuine issue of material fact." Mem. L. Supp. Mot. Partial Summ. J. 26 (citing *Perez v. Transformer Mfrs., Inc.*, 35 F. Supp. 3d 941, 955 (N.D. Ill. 2014)). In *Transformer Manufacturers*, the court described the plaintiff's evidence of an improper motive as follows: "[The employer] was aware that [the employee] filed a [worker's compensation] claim, that the claim was denied, and that [the employee] was unable to perform the duties of a 'hand winder'" prior to terminating the employee. *Transformer Mfrs.*, 35 F. Supp. 3d at 955. The court concluded that the plaintiff's evidence of improper motivation relied solely on timing, and therefore was insufficient as a matter of law. *Id.* Here, White has more than just timing or a mere sequential connection. *See Walker*, 915 F.3d at 1157. He has evidence which reasonably suggests that the decisionmaker was improperly motivated, namely the October 19 texts about the DeWalt fire between Wetzel and Foong. A trier of fact could reasonably consider those texts and conclude that Wetzel expressed disapproval of White's protected activity, during the time period when the decision to fire White was being considered and ultimately made. Those texts, coupled with Foong's after-the-fact denials of even knowing of the texts, elevate White's case from one consisting solely of a simple series of events or suspicious timing.

Third, Deere argues that "the record belies any reasonable inference that Deere reacted adversely to or sought to minimize any safety concerns that [White] did raise." Mem. L. Supp. Mot. Partial Summ. J. 26–27. Deere points out that people like Wetzel, Preston, and Guyot listened to White's concerns and connected him with more technical employees to discuss those concerns. *See, e.g.*, Def.'s Excerpt White Dep. 55:1–56:13 (describing how Preston connected White with Matt Kenitzer, an engineer tasked with battery manufacturing, to discuss White's safety concerns in March 2022). When White brought his safety concerns to Wetzel, Wetzel assured him that "Deere would not put an unsafe product on the market." Wetzel Decl. ¶ 9.

When White asked for technical information about an existing Kreisel battery, he received at least some of that information.  *See* June 24, 2022 Email from Duffield to Heimbuch (providing information about the "shock and vibe specifications" of the KBP63 to an engineer, cc'ing White).  Deere asserts that the disagreement over testing was not about whether the Kreisel battery that would go into the Carver tractor would eventually be tested for safety issues— Preston continuously maintained that once White's team gave her team the tractor's requirements, they would design and test a battery that could meet those requirements.  *See* Aug. 11, 2022 Email from Preston to White.  Instead, the dispute was about who would perform that testing and at what stage of the design process.  *Id.*  Deere concludes that nothing in the record suggests that it had any reason to fear testing of the existing KBP63 batteries because the Carver tractor's battery was not designed yet and the tractor itself was years away from a public release. It likens the situation to a laboratory which had no reason to fear scrutiny from the Occupational Safety and Health Administration because it was already subject to unannounced inspections. Mem. L. Supp. Mot. Partial Summ. J. 26–27 (citing *Ramon v. Ill. Gastroenterology Grp., LLC*, No. 19 C 1522, 2021 WL 1088316, at *10 (N.D. Ill. Mar. 22, 2021)).

*Ramon* is distinguishable because Deere was not required to submit the Kreisel batteries to outside scrutiny at this early stage of the Carver tractor's design—when White proposed that an external entity test the batteries, Preston was free to, and did in fact, reject that proposal.  *See* Sept. 2, 2022 Email from Preston to Sobotzik & White.  Moreover, the record does allow for a reasonable inference that Deere did have reason to be concerned about safety testing by non-JDPS employees.  Deere invested in Kreisel batteries by acquiring a majority stake in Kreisel and intended to use the batteries in many products.  *See* Def.'s Excerpt Preston Dep. 35:18–21, Yee Decl. Ex. B, Mem. L. Supp. Mot. Partial Summ. J., ECF No. 33-1 at 154–63; Preston Decl.

¶¶ 3, 6, Mem. L. Supp. Mot. Partial Summ. J., ECF No. 33-3 at 1–3; Pl.'s Excerpt Wetzel Dep. 36:3–9. Kreisel batteries had previously caused two fires. Pl.'s Excerpt Preston Dep. 49:18–50:2. If a vocal opponent of Kreisel batteries, such as White, received access to testing data that was not controlled by JDPS and suggested an expensive-to-fix and risky safety flaw, that could lend support to White's campaign that Deere abandon Kreisel in favor of another battery supplier. *See* Oct. 19, 2022 Text from White to Wetzel ("There are rumors swirling that JDPS has started testing and getting poor results and thus not wanting us to test."). Viewing the evidence in White's favor, Deere, and JDPS in particular, did have reason to fear "abusive" testing, *see* Sept. 2, 2022 Email from Duffield to Preston, and its potential to undermine the company-wide buy-in for a crucial component that it hoped to use across many products in the future.

Ultimately, whether Deere was sufficiently incentivized to address the potential safety risks posed by Kreisel batteries is not amenable to resolution as a matter of law on this record. Consider the analogous context of retaliation claims brought under section 15(b) of Illinois's Whistleblower Act, 740 ILCS 174/15(b).[5] In *Brame v. City of North Chicago*, the employer argued that it was entitled to summary judgment because "reasonable minds could not differ" as to the conclusion that the employee "had no reasonable belief that a crime had been committed." 955 N.E.2d 1269, 1273 (Ill. App. Ct. 2011). The Illinois Appellate Court, relying upon the requirement to construe the evidence in the nonmovant's favor and the general rule that "reasonableness is a question of fact rather than a question of law," rejected this argument and declined to conclude that the employee's belief that a crime had been committed was

---

[5] "An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation." 740 ILCS 174/15(b).

unreasonable as a matter of law.  *Id.*  Here, the evidence related to prior battery fires and Preston's rejection of White's detailed testing proposal supports a contrary reasonable inference that there were potential issues to be worked out with the Kreisel batteries and that Deere did not want White—a vocal and persistent opponent of Kreisel batteries generally—to design and oversee their testing.  The Court declines to decide as a matter of law that the only reasonable conclusion to draw from this record is that Deere had nothing to fear with respect to allowing White to control testing of the Kreisel batteries.

Fourth, Deere argues that it is entitled to summary judgment because it has provided valid reasons for White's termination "supported by undisputed record evidence."  Mem. L. Supp. Mot. Partial Summ. J. 27–29.  Deere has amply shown that: (1) White clashed with his supervisory colleagues; (2) His supervisees thought that he was doing a poor job of leading the Carver team; and (3) He drank a beer during a work meeting despite being asked to refrain from that behavior.  Yet a legitimate reason for termination is not sufficient if a trier of fact could reasonably conclude that the employer did not honestly believe that those legitimate reasons were the true motivation for the termination.  The employer in *Hubert* had also mustered evidence from "several of [the employee]'s colleagues and subordinates" demonstrating the employee's inappropriate and unprofessional behavior.  *Hubert*, 169 N.E.3d at 837.  Summary judgment was unwarranted because the employee's supervisor had "stated his displeasure" with the employee's protected activity, such that there was an issue of material fact regarding pretext.  *Id.* at 838–39.  In another case, an employer showed that its employee refused to obey a direct order, which was "a valid ground for termination."  *Kirchhoff v. Chem Processing, Inc.*, No. 20 C 50242, 2023 WL 157922, at *9 (N.D. Ill. Jan. 11, 2023).  However, because a trier of fact

could believe that the employee "was fired because he complained about the unsafe condition" of

the workplace, summary judgment was unwarranted.  *Id.* at *10.

Here, Deere's ample evidence of terminable misconduct is, by itself, similarly

insufficient to warrant summary judgment in Deere's favor.  Deere attempts to distinguish

*Hubert* and *Kirchhoff* by asserting that there is no evidence that Wetzel expressed any

displeasure with White's protected activity.  *See* Reply Mem. L. Supp. Mot. Partial Summ. J. 22–

23.  But this argument ignores the reasonable inference which can be drawn from evidence like

the October 19 texts between Foong and Wetzel about the DeWalt fire.  Again, viewing the

record as a whole, it would be reasonable to interpret Wetzel's statement of "Exactly!" as

agreeing with Foong's statement that White needed to "stay in his lane and stick to facts," and

that Wetzel therefore expressed his displeasure with White's activities.  Oct. 19, 2022 Texts

Between Wetzel & Foong.[6]

Finally, Deere argues that White's misconduct occurred between his protected activity

and his termination, such that "any causal connection [wa]s broken by that intervening event."

Mem. L. Supp. Mot. Partial Summ. J. 29–30.  It points to *Reid*, where the employee's

termination was immediately preceded by the discovery of pervasive violations of the

---

[6] Deere's other citations are also distinguishable or inapposite.  *See* Mem. L. Supp. Mot. Partial Summ. J. 27–29.
Deere points to *Kupperman v. Tanu, Inc.*, No. 1-13-3347, 2014 WL 5798351, at *7 (Ill. App. Ct. Nov. 6, 2014), for
the proposition that summary judgment is appropriate if the employee's performance was indisputably deficient.
Mem. L. Supp. Mot. Partial Summ. J. 28.  However, the Illinois Appellate Court found that summary judgment was
appropriate in *Kupperman* because the employee's affirmative evidence of causation was simply that the employer
gave one reason for his termination at the time he was informed of that decision yet gave different reasons during
discovery.  *Kupperman*, 2014 WL 5798351, at *7–8.  Here, White has done more than simply point to a shifting
litigation strategy—he has mustered facts, such as the October 19 texts between Foong and Wetzel about the
DeWalt fire and Foong's deposition testimony concerning those texts, which create a genuine dispute of material
fact regarding what motivated Wetzel to terminate him.  Deere also points to *Rhodes v. Professional Transportation,
Inc.*, 3 F. App'x 515, 519 (7th Cir. 2001), an unpublished Title VII case which notes that an employee's subjective
assessments of her actions and the seriousness thereof is irrelevant to the issue of pretext.  White does advance many
arguments which sound in subjective disagreement with whether his performance was deficient.  *See, e.g.*, Resp.
Mot. Partial Summ. J. 87–88 (disputing whether White's relationship with Preston was actually "beyond repair").
However, as just explained, other evidence allows for a reasonable inference that Wetzel did not honestly believe the
reasons that Deere asserts were the basis for White's termination.

employer's policies. *See Reid*, 749 F.3d at 589. This argument is premised upon Deere's assertion that the decision to terminate White was indisputably made before Foong and Wetzel exchanged texts on October 19 about the DeWalt fire. Yet, as explained above, the date on which Wetzel made the decision to terminate White is genuinely disputed. The Court cannot conclude as a matter of law that White's misconduct, such as drinking a beer on October 14, severed a potential causal relationship between his termination and protected activity.

The Court is not deciding what is the best or most believable inference to draw from the record as a whole. Instead, the Court must decide whether a reasonable trier of fact could draw the inference that Wetzel disapproved of White's protected activity, such that the decision to terminate him was improperly motivated by his protected activity. *See Hubert*, 169 N.E.3d at 837. Because White has mustered evidence sufficient to persuade a reasonable trier of fact to infer that Wetzel harbored an improper motive and did not honestly believe the reasons which Deere provided for White's termination, summary judgment is unwarranted.

## CONCLUSION

Accordingly, Defendant Deere & Company's Motion for Partial Summary Judgment, ECF No. 32, is DENIED.

Entered this 15th day of January, 2025.

s/ Sara Darrow
SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE